Campbell Carrington v. Commissioner.
Carrington v. Commissioner
Docket Nos. 13281 and 15365.
United States Tax Court
1948 Tax Ct. Memo LEXIS 226; 7 T.C.M. (CCH) 162; T.C.M. (RIA) 48045; March 30, 1948
*226 Max Herzfeld, Esq., and David Schnitzer, C.P.A., 270 Broadway, New York, N. Y., for the petitioner. R. O. Carlsen, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These proceedings were brought for a redetermination of deficiencies of $1,348.95 and $1,649.95 for the taxable years 1943 and 1944, respectively. The sole question involved is whether receipt by petitioner of $8,000 in each of the respective years constituted payment to petitioner of compensation for personal services or proceeds from the sale of stock in a prior year. Findings of Fact Petitioner, an individual, whose business address is in New York City, filed his Federal income tax returns for 1943 and 1944, the years involved, with the collector of internal revenue for the fourteenth district of New York. From 1916, until the end of 1941, petitioner was an officer and director of Williams Press, Inc., a corporation hereinafter sometimes referred to as the "Company," having offices at Albany and New York City, and of its predecessor, the J. B. Lyon Company. For some time prior to February 27, 1942, petitioner was the owner of 2,859.4 shares of the Company, *227 which he acquired in 1916 at a cost of $131,400. The total outstanding stock of the Company on that date was 17,000 shares. The stock was closely held by the McGraw-Hill Publishing Co. (6,220 shares), Charles M. Winchester and his six sons, and the Barvoets family. A few shares were held by employees in the plant. The stock was unlisted and had no sale in the open market. In the latter part of 1941 petitioner, who was then receiving compensation of $5,000 per annum, was notified that his compensation would cease on December 31, 1941. New interests in the business objected to petitioner receiving any money from the Company and they wanted to reduce expenses. At this time petitioner was heavily in debt, and under financial pressure. His stock in the Company had been pledged as collateral security with various banks and individual creditors, on loans aggregating in excess of $60,000, and petitioner was indebted to the Company in the amount of $1,950, being the unpaid balance of an original indebtedness of $2,500 which was being repaid at the rate of $50 per month by deductions from petitioner's compensation. The Company was doing a profitable business and was in a position to pay *228 dividends to its stockholders. Despite repeated requests by petitioner, the Company failed to pay dividends for five years prior to December 31, 1941. Petitioner, after that date, was the only stockholder who was not on the payroll of the Company, or benefiting through doing business with the Company. Petitioner believed that he was being discriminated against, and protested that the business was not being run for the benefit of the stockholders. He stated that he contemplated filing a minority stockholder's suit against the Company. He also offered to secure a purchaser for all of the Company stock, or, in the alternative, to sell his shares to the Company. Petitioner had been closely associated with the Company and was familiar with its management and financial condition. He knew that one of the other members of the syndicate which bought the stock in 1916, having the same interest in the stock as he had, had sold the stock to the company for $250,000. The Company's financial statement as of July 31, 1941, disclosed a book value of $106.89 per share. The Company had a long history of profitable and successful business, never having had a year without net profits. It had a new plant *229 and excellent good will and prospects. Shortly after February 8, 1942, petitioner had negotiations with Rollin B. Sanford, who was attorney for the Company. They discussed the purchase of petitioner's stock by the Company. It was felt that petitioner's appraisal of the stock as being worth more than $100 a share represented more money than the Company could take out of the business. The Company had large commitments of new machinery and would have to obtain the money to pay petitioner from the National Commercial Bank, which would have to approve of the arrangement. During the course of the negotiations petitioner, who was 67 years of age at that time, made the proposition that the Company pay him $75,000 for the stock and give him $12,000 a year for the balance for eight or ten years. The Company knew petitioner's personal affairs in a general way and his desire to have some sort of insurance which he needed to carry on. Petitioner did not advise the Company that he was being pressed for money. A counter offer by the Company was for $7,000 a year for five years. They ultimately reached an agreement. The negotiations took several weeks and were on a friendly basis. On February 27, 1942, petitioner *230 entered into two contracts with the Company. One of them provided: "This will confirm your agreement to sell, and our agreement to buy a total of 2,859.4 shares of common stock of this Corporation for the sum of $75,000 payable in installments as follows: $5,000 upon the signing of this agreement and the delivery to us of 249.4 shares of stock, and $5,000 on July 1, 1942, and each four months thereafter until the total of $75,000 has been paid, such future installments aggregating $70,000 to be evidenced by the promissory note or notes of this Corporation without interest and maturing to meet the payments as above specified. Such notes will be lodged with the National Commercial Bank & Trust Company, Albany, for delivery to you against receipt on or before March 10, 1942 of the balance of the said 2,859.4 shares (whether in the form of Voting Trust Certificates or certificates for stock of the predecessor, J. B. Lyon Company) duly endorsed for transfer." The other provided: "We have been discussing with our directors the renewal and extension of your arrangements with us as advisor and consultant for the Sales Department and I am authorized now to make to you the following proposal, *231 to wit: You are to receive a salary of $8,000 commencing January 1, 1942, instead of the $5,000 salary which you received up to the beginning of this year, such increased salary to be payable monthly as heretofore and to continue for a period of six years terminating December 31, 1947, or, in the event of your death, at the end of the year in which the same occurs. In the event that you render services at the Company's written request or with its written approval outside of New York City, you are to be paid for such time spent in such services outside of New York City at the rate of $50.00 per day and expenses in addition to your regular monthly salary. Please confirm this arrangement by signing and returning a copy of this letter for our files." The minutes of a meeting of the Company's board of directors, held February 25, 1941, recited, in part, as follows: "RESOLVED that the Treasurer of Williams Press, Inc., out of the Corporation's surplus assets, be and he hereby is authorized to purchase from Campbell Carrington his 2859 shares of the Common Stock of this Company for the sum of $75,000.00, payable as follows: $5,000.00 in cash on the delivery of the stock and the balance *232 by the note of this Corporation in the sum of $70,000.00 payable in equal installment of $5,000.00 each, without interest, the first payment on account of the note to be made July 1st, 1942 and a similar payment each fourth month thereafter until the full amount is paid." They further recited: "The continued employment of Campbell Carrington as Sales Advisor, at a salary of $8,000 per year commencing January 1st, 1942, was authorized. Such employment was authorized for a period of six years, unless it should happen that Mr. Carrington should sooner die." The form of the arrangement was also satisfactory to the bank. Payment was made and petitioner's financial pressure was relieved. Petitioner was aware of the nature of the instruments he executed. Petitioner received the amounts provided by the contract of employment in bi-monthly payments, throughout 1942, 1943 and 1944. In his income tax return for 1942 petitioner reported the foregoing transactions as the sale of the 2,859.4 shares of stock to the Company. The return stated: SCHEDULE F - CAPITAL LOSSES: 2859.4 sh. Williams Press, Inc. (formerly J. B. Lyon Company), Albany, N. Y.
Cost (1916)
$131,400.00
Sales Price (2/27/42)
117,657.43
Cash on Contract
$ 5,000.00
Note of Williams Press, Inc.
$70,000.00
Less: Discount on Sale of Note
5,342.57
64,657.43
Agreement to pay $8,000 per Year beginning 1/1/42
and ending 12/31/47, a total of six years ($8,000
received in 1942)
48,000.00
Net Loss on Sale of Stock - Williams Press, Inc.
$ 13,742.57
*233 On his return for 1943 was a rider, as follows: "Non-Taxable Income: "Received in 1943 from Wil-
liams Press, Inc. Albany,
N. Y.
$8,000.00
"In 1942, taxpayer sold 2859.4 shares of capital stock of Williams Press, Inc. to the corporation, and received certain cash in 1942, plus an agreement from Williams Press, Inc. to pay to taxpayer $8,000. per annum from 1/1/42 to 12/31/47, or a total of $48,000. "Taxpayer reported in his 1942 return as proceeds from the sale of this stock, the entire amount of cash received in that year plus the total of $48,000, as above. "The payment of $8,000 received in 1943, is deemed therefore to be non-taxable in 1943." A similar rider was attached to petitioner's return for 1944. The Company filed forms W-2 (Statement of Income Tax Withheld on Wages) for 1943 and 1944, in which it reported annual payments of "wages" of $8,000 to petitioner in these respective years, but no income tax withheld. The Company also gave petitioner an "Annual Wage and Tax Record" for 1942 disclosing "Total Wages" of $8,000, but no old age benefit, or unemployment insurance tax. Petitioner, after receiving from the Company his copies of the *234 W-2 form, registered an objection with the Company that it had reported the payments to the Federal government for tax purposes. The Company replied by letter dated January 5, 1945, that they considered him an employee. While he was a director and employee of the Company, prior to December 31, 1941, petitioner as a director reviewed statements and made suggestions to the board of trustees; he gave advice, particularly in connection with financial matters, and matters of policy. He did not have a written contract and was never required to attend regularly at the Company's place of business. In 1942 the Company's vice president in charge of metropolitan New York sales continued to see petitioner as he had in the past, and on occasions consulted with him about certain sales contracts he wished to make, including contracts with the Ahrends Publishing Company, General Foods Corporation, and the National Association of Manufacturers. He consulted with petitioner because he had been advised by the president of the Company that its employment contract with petitioner was in effect. It was upon that authority that he proceeded. Petitioner responded to him as if he understood that to be *235 the situation. Such consultations were very infrequent. Petitioner did not report at the vice president's office in 1942, but would come in and meet with company officials. In 1944 petitioner lost his own office and sought and obtained leave from the Company's president to use space in the Company's New York City office, which he has since occupied. Petitioner paid no rent. Petitioner's name appears on the list of New York City employees. The $8,000 received by petitioner from the Company in 1943 and 1944 were payments of compensation for services, and not on account of the purchase of any of petitioner's stock in the Company. Opinion Petitioner, in his effort to overcome the presumption of correctness attaching to respondent's determination, is, at the outset, confronted with his own formal written contracts, which on their face sustain respondent's position. These contracts were the result of lengthy negotiations growing out of petitioner's relationship to the Company in the dual capacity of employee and stockholder. Two separate instruments were executed, dealing respectively with these distinct problems; the one was clearly a contract to buy petitioner's stock in the Company, *236 and the other certainly purports to be a contract for petitioner's services. There is a suggestion that the stock which petitioner transferred was worth considerably more than the $75,000 paid for it, leading to the inference that both contracts were in payment for the stock. However, the Company was a close corporation; petitioner's stock represented merely a minority interest; the payment of dividends was highly improbable at least without expensive litigation; and the stock had no ready market. It would be easy to conclude that petitioner obtained the best possible price for it. Moreover, it appears that $75,000, at one stage of the negotiations, was petitioner's own proposed figure. And petitioner's present estimate of the value of the stock is so greatly in excess of what he received on either hypothesis, that one must either ignore it or conclude that the purchaser was driving a hard bargain to which petitioner had to accede, regardless of values. Under the contemporaneous employment contract, petitioner was to continue to render the Company services of a nature substantially similar to those he had heretofore rendered during a period in which it appears to be conceded that *237 he was an employee receiving compensation as such. Our finding of fact, made from a record which, to be sure, is not without contradictions, is that during the years in controversy petitioner was available and was used as an employee by the Company. And a not insignificant term of the employment contract called for termination of the salary payments upon petitioner's death. Cf. , affirmed (C.C.A., 6th Cir.), , certiorari denied, . Apparently the payment was treated as salary by the employer. See , certiorari denied, . Direct evidence before us does not disclose that the Company took an annual deduction for the $8,000 as a payment of salary, but we know that it reported to the Federal government that it paid petitioner these sums as wages; and any absence of evidence on this score cannot inure to petitioner's benefit. We cannot escape the conclusion that petitioner was, perhaps by the pressure of his situation and possibly reluctantly, led to enter upon an employment relationship, *238 the tax consequences inherent in which are not to be deflected by any apparent hardship. Respondent must be sustained. Decisions will be entered for the respondent.